## Shaw v. Pittsburgh-Corning Corp.

*Joseph D. Shein,* for plaintiffs.
*Edward J. David,* for defendant Pittsburgh-Corning.

KING, *J.*, March 5, 1984—Plaintiff, Catherine Shaw, on behalf of the estate of her deceased husband, Joseph Shaw, and in her own right, instituted suit against Johns-Manville Corporation and numerous other manufacturers of asbestos-containing products for damages due to asbestos related injuries.

The case herein was tried, without a jury, before this court from January 24, 1983, through January 28, 1983. Of the named original defendants against whom the suit was instituted, all settled with decedent's plaintiff except Johns-Manville, Pittsburgh-Corning Corporation, Amatex Corporation and UNARCO Industries, Inc. During 1982, Johns-Manville, Amatex and UNARCO, defendants herein, filed bankruptcy proceedings under Chapter XI of the Bankruptcy Code.[1] The remaining defendant Pittsburgh-Corning Corporation did not settle and on February 7, 1983, this court found for plaintiff on the issue of causal connection and for defendant Pittsburgh-Corning on the issue of successor liability. This opinion will only address the issue of successor liability.

Plaintiff contends that the alleged injuries to decedent were due to exposure to asbestos-containing products during the period of 1940 - 1971. Defendant Pittsburgh-Corning purchased Unibestos, an asbestos-containing product, from UNARCO in 1962. Before that time Pittsburgh-Corning did not manufacture asbestos-containing products.

---

1. UNARCO filed for bankruptcy under Chapter XI of the Bankruptcy Code on July 29, 1982. Johns-Manville Corporation filed on August 26, 1982. Amatex Corporation filed on November 1, 1982. The "Fourteenth Pre-Trial Order," dated September 24, 1982, granted severence in any asbestos-related case presently pending before this court in which UNARCO and/or Johns-Manville are party defendants.

Plaintiff argues, however, that because UNARCO has filed in bankruptcy under Chapter XI of the Bankruptcy Code and Pittsburgh-Corning purchased an asbestos product from UNARCO, Pittsburgh-Corning should be liable under the theory of successor liability.

The general rule in Pennsylvania regarding successor liability is that when one company sells or transfers all of its assets to a successor company, the successor does not acquire the liabilities of the transferor's assets. Amader v. Pittsburgh-Corning Corporation, 546 F. Supp. 1033 (E.D. Pa. 1982); Dawejko v. Jorgenson Steel Company, Pa. Super. 434 A.2d 106 (1981); Jacobs v. Lakewood Aircraft Service, Incorporated, 512 F. Supp. 176 (E.D. Pa. 1981); Husak v. Berkel, Incorporated, 234 Pa. Super. 452, 341 A.2d (1975).

There are, however, several exceptions to the general rule:

(1) agreement by purchaser corporation to assume obligation.

(2) consolidation or merger of the two corporations.

(3) continuation of the selling corporation by the purchasing corporation.

(4) fraudulent transaction.

(5) inadequate consideration for transfer and failure to make provisions for creditors of selling corporation.

The Pennsylvania Superior Court recently adopted a new exception, the product-line exception, which was enunciated by the New Jersey Superior Court in Ramirez v. Armsted Industries, 86 N. J. 332, 358, 431 A.2d 811, 825 (1981):

"Where one corporation acquires all or substantially all of the manufacturing assets of another corporation, even if exclusively for cash, and under-

takes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product-line, even if previously manufactured and distributed by the selling corporation or its predecessor." Dawejko, supra, at 110, quoting Ramirez, supra, at 825.

In adopting this exception, the court, in Dawejko, noted that the rule should be articulated in general terms, so that the rule may be applied to any situation in considering whether a product-line successor corporation is liable for injuries caused by the product defect manufactured by the original manufacturer. Id, at 111. The New Jersey Superior Court, in formulating this rule, relied upon the three-prong test articulated by the California Supreme Court in Ray v. Alad Corporation, 19 Cal. 3d 22, 560 P.2d 3 (1977). The California Court formulated this test based on public policy considerations so that victims of manufacturing defects would not be defenseless, leaving to society the cost of compensating them. Dawejko, supra, at 111, quoting Ramirez, supra, at 825.

The Ray test provides for the imposition of liability upon a successor corporation when three situations are present:

"(1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business; (2) the successor's ability to assume the original manufacturer's risk-spreading role; and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." Dawejko, supra, at 109, quoting Ray, supra, at 8 - 9.

The Pennsylvania Courts have not adopted the Ray test, but have found it useful in considering whether to apply the product-line exception formulated in Ramirez which is whether the purchasing corporation obtained all or substantially all of the assets of the selling corporation. The purpose of the product-line exception is to afford a claimant an opportunity to bring a product liability action against a successor corporation where his or her rights against the predecessor corporation have been essentially extinguished, either "de jure," through dissolution of the predecessor, or "defacto," through sale of all or substantially all of the assets of the predecessor. Pizio v. Johns-Manville Corporation, 9 Phila. 447, 452 (1983).

Here, there is no evidence that UNARCO has been extinguished or that Pittsburgh-Corning Corporation has purchased substantially all of UNARCO's assets. The purchase agreement clearly provides that UNARCO was selling its Unibestos line and that the two corporations would continue to operate separately and distinctly.[2]

2. Paragraph 1 of Article VIII of the Sales Agreement between Pittsburgh-Corning Corporation and UNARCO provides: 1 Union agrees that for a period of not more than five years after the closing date, it will not engage in the United States in the production and/or sale of any high temperature insulation product containing asbestos with which it will compete with PC in respect of PC's H-T product business, nor will it invest in any organization which is in such business. PC recognizes that, apart from the H-T product business, Union offers the following lines of insulation and packing products, containing asbestos, which Union sells: Insubestos felt; Insutape, Wovenstone; Insutube; Type H insulation, Type SF insulation; asbestos cloth and textile; asbestos tape; abestos tubing, asbestos wick and rope; asbestos yarn, asbestos packing; and UNARCO-board. For purposes of this paragraph, PC acknowledges that the continuation by Union of sales of products of these lines in the sizes, shapes and densities in which

The product-line exception is to be applied if the requirements in Ramirez are met. The first requirement, calling for the acquisition of all or substantially all of the manufacturing assets of the selling corporation, has not been met. The agreement of sale specifically provides for Pittsburgh-Corning Corporation to acknowledge UNARCO's continuation of the manufacture and sale of asbestos-containing products.[3]

The second requirement calls for the purchasing corporation to undertake the same manufacturing operation as the selling corporation; hence, acquiring the resources the selling corporation would have used to meet the product liability claims. This requirement is based on social policy considerations. If the successor corporation acquires the resources to compensate victims of manufacturing defects, then the purchasing corporation should be held liable for those manufacturing defects originated by the selling corporation. Again, the agreement of sale is evidence that UNARCO intended to continue to manufacture asbestos-containing products. Therefore, the second requirement, the successor's ability to assume the manufacturing risk-spreading role has not been met.

The final consideration is whether it is fair to require Pittsburgh-Corning to assume liability for a claim that should be made against UNARCO. We

---

Union now offers same for sale according to its most recent UNARCO general sales catalogue does not and will not constitute competition with PC in respect of its H-T product business. Such acknowledgment shall not be construed to limit Union's right to vary sizes, shapes and densities of its above-mentioned products in any, subject only to the limitation contained in the first sentence of this paragraph 1.

3. Id.

conclude, that under the facts presented here, it would not be fair.

Pittsburgh-Corning did not purchase all of the assets of UNARCO. Pittsburgh-Corning only purchased a product-line, Unibestos. UNARCO continues to manufacture other asbestos-containing products. There is no indication that Pittsburgh-Corning held itself out as the ongoing enterprise of UNARCO.

Accordingly, we agree with the rationale of Judge Takiff in Pizio, supra, that to serve the goals of the product-line exception, the selling corporation must cease to exist. Here, UNARCO remains a viable defendant, although under Chapter XI bankruptcy proceedings.[4] To allow plaintiff to hold the selling corporation and the successor corporation liable and responsible for a single series of events attributable to only one party, would be unjust. The purchase agreement, between the selling corporation and the successor corporation, clearly indicates that neither party anticipated that dual responsibility and liability would be imposed.[5]

---

4. Shortly after UNARCO filed for Chapter XI under the Bankruptcy Code, the Superior Court of Pennsylvania affirmed the lower court's order of September, 1982, granting a severance and stay of any claims against Johns-Manville and UNARCO. Matthews v. Johns-Manville Corporation, Pa. Super. 453 A.2d 362, 1982. The severance, however, does not preclude non-bankruptcy defendants from recovering contribution or indemnification from those bankrupt defendants. Plaintiff in the instant action may proceed against UNARCO when the stay imposed by the operation of the bankruptcy proceedings is lifted. Therefore, UNARCO remains a potential defendant.

5. Provision 7 of Article VI of the Agreement of Sale between Pittsburgh-Corning Corporation and UNARCO provides: Union will indemnify PC against liability and hold it harmless from loss in respect of any claim which may be as-

We, therefore, hold the defendant Pittsburgh-Corning Corporation not liable to plaintiff under the doctrine of successor liability.

---

serted against PC arising from, or as a result of, or related to Union's conduct or operation of the H-T product business to and including the closing date hereof, whether such claim is asserted in respect of Union's obligation under any contract or agreement which, at PC's request, it has assigned to PC pursuant to paragraph 2 of this Article VI, for claims, if any, for damages caused by or arising out of the manufacture and sale of H-T products which heretofore have been sold or distributed by Union prior to closing date, and in the event of any such claim, Union will promptly notify PC of any such claims which may be asserted against Union in respect of the H-T product which it had made, used or sold prior to closing date.